**James Alan ARNETT, Petitioner,**

v.

**Samuel LEWIS, et al., Respondents.**

**No. CV 83–2157–PHX–SMM.**

United States District Court,
D. Arizona,
Phoenix.

Oct. 5, 1994.

Lynn Marie Anderson, Hadley, Poach & Harraway, P.C., Phoenix, AZ, John Trebon, Flagstaff, AZ, for petitioner.

Diane M. Ramsey, Atty. Gen's Office, Crim. Div., Crane McClennen, Ariz. Atty. Gen's Office, Crim. Appeals Section, Phoenix, AZ, for respondents.

## MEMORANDUM OF DECISION AND ORDER

McNAMEE, District Judge.

James Alan Arnett (hereinafter "Petitioner") commenced this federal habeas proceeding in November, 1983, and subsequently raised additional allegations of constitutional error in an amended petition filed on November 28, 1989. The Court previously determined the merits and/or procedural status of all but one of Petitioner's claims. *See Arnett v. Ricketts,* 665 F.Supp. 1437 (D.Ariz.1987) [file doc. no. 80]; Order of 4/1/94 [file doc. no. 174].

In his remaining claim Petitioner alleges that he provided a confession only after his will was overborne due to coercive police conduct, the conditions of his confinement in the Richmond City Jail in Richmond, California, and the inordinate delay he experienced before being brought before a judicial officer. The Court determined that Petitioner was

entitled to an evidentiary hearing with respect to this claim.[1]

On September 15, 1993, the Court held a status conference for the purpose of determining a date certain for the evidentiary hearing. In addition, the Court and the parties discussed several procedural difficulties related to the hearing and final resolution of the petition. At the conclusion of the status conference, the Court admitted into evidence the videotaped depositions of William Veale, Diane Needham, Bruce Weiss, Janice Rhodes, Andrew Schwartz, and George Neal Newton. In addition, the Court admitted all unopposed records relating to Petitioner's arrest offered as attachments to the transcript of Mr. Newton's deposition. Specifically, the Court admitted attachments 7, 8, 10, 13, 14, 15, and 16.[2] The Court also informed the parties that it would further review the opposed attachments and determine whether they would be admitted over Respondents' objections.[3]

On September 28, 1993, the Court overruled Respondents' hearsay objections and determined that the other attachments were admissible as "public records" pursuant to Rule 803(8) of the Federal Rules of Evidence. See Order of 9/28/93 [file doc. no. 155 {incorporated herein by reference} ]. In addition, the Court reviewed its jurisdictional powers pursuant to Rule 45(c)(3)(B)(iii) of the Federal Rules of Civil Procedure to determine whether it could and would issue subpoenas to out-of-state witnesses whose presence and testimony was sought primarily for the purpose of establishing the conditions under which Petitioner was confined.

Upon review, the Court found that although the testimony regarding jail condi-tions was important, Petitioner failed to demonstrate a "substantial need" for the physical presence of witnesses in Phoenix. See Order of 9/28/93 at pg. 10. Nor did the Court find that Petitioner would incur "undue hardship" if portions of the evidentiary hearing were conducted based upon videotaped depositions. In concluding that it would authorize Petitioner to subpoena witnesses in California for the purpose of conducting videotaped depositions the Court made the following findings:

> The Court finds that videotaped depositions of Petitioner's potential witnesses will ensure that he receives a full and fair opportunity to adjudicate his claim while minimizing unnecessary expense to the taxpayers. Moreover, conducting videotaped depositions may eliminate the need for unnecessary and duplicative discovery which the parties indicated may be required if witnesses were required to appear before this Court in person.

Order of 9/28/93 at pg. 11.

Beginning on November 16, 1993, the Court conducted a five-day evidentiary hearing. At the hearing the Court reviewed and/or considered the videotaped testimony of the following witnesses: Andrew Schwartz; Diane Needham[4]; William Veale; Janice Rhodes; Bruce Weiss; George Neal Newton; Billy Sewell; Weston Kevin Sockwell; William Faulkner; Mary Caruthers; Moses Madison York; Emma Brausch; and Thomas Hernandez.[5] In addition, the following witnesses testified in person: Otto L. Bendheim, M.D.; Richard J. Ofshe, Ph.D.; William McKinley, M.D.; Lieutenant Robert Parrick, Richmond City Police Department;

1. This case was originally assigned to United States District Judge Charles L. Hardy. See Arnett v. Ricketts, 665 F.Supp. at 1446.

2. The Court will refer to these records as "attachments" to avoid any confusion with material submitted as "exhibits" during the evidentiary hearing conducted in November and December of 1993.

3. Most of the attachments are microfilm copies of typed arrest reports issued under Petitioner's name or one of his known aliases. The attachments help explain Petitioner's detention at the Richmond City Jail in 1976.

4. Spelling of last name corrected on notice of changes.

5. The Court viewed the video tapes of the last seven witnesses in the presence of counsel and Petitioner and stopped the tapes, when necessary, to rule upon objections raised during the deposition. The Court reviewed the other videotapes in camera prior to the hearing and upon stipulation of the parties, did not view them again in open court.

and Petitioner. For convenience the Court will divide the findings of fact into three categories: (1) the various arrests which accounted for Petitioner's detention in the Richmond City Jail; (2) the conditions under which Petitioner was confined and his physical health; and (3) police conduct prior to and at the time of Petitioner's confession. It should be noted that although a large number of attachments detail when Petitioner may have appeared before a judicial officer and various judicial proceedings occurring in March of 1976, the events up to the point at which Petitioner confessed on February 25, 1976 are most relevant to the resolution of the pending claim.

### FOREWORD

This is a case burdened with ambiguities and enigmas. Although the Court has endeavored to resolve each of them in turn, many of the mysteries can never be resolved definitively or conclusively.

In this case, the Court is confronted with a street-wise defendant, James Arnett, who upon being arrested conceals his identity and asserts his *Miranda* rights. The day after his initial arrest Petitioner became aware that his identity was known and that he was suspected of murder in another state. Despite repeated overtures to make a statement, Petitioner repeatedly invoked his right to remain silent for approximately seven days. On the seventh day, however, and according to Respondents for no apparent reason, Arnett summons the police and provides the police with a comprehensive tape recorded statement.

In attempting to determine why Petitioner suddenly confessed after one week of silence, the Court must also consider the effect of the somewhat questionable conduct by the police who clearly capitalized upon ambiguities within the law. For example, although Arnett was arrested on multiple charges, no evidence was presented regarding why Petitioner was not taken before a judicial officer at any time prior to his confession. Although Respondents rely heavily upon the "parole-hold", which technically legalized Petitioner's detention, no explanation was provided or appears in the record as to why Petitioner's

arraignment was initially delayed, yet occurred within the time frames dictated by state statutes once he confessed. Also troubling is the fact that the primary officer involved in the case is a California burglary detective who continuously interacts with the defendant several times per day over the course of a week yet paradoxically asserts he has no interest in the case once it became known that Petitioner was suspected of murder. It is beyond dispute, however, that the officer's interest had little to do with the burglaries which he himself stated were minor in nature and would not have warranted constant attention for over a week. Similarly puzzling are the actions of the Arizona authorities who, after questioning Petitioner and apparently having enough circumstantial evidence to obtain a warrant, fail to do so until five days pass and Petitioner admits his involvement in the offense.

The issue is whether Arnett's will was overborne in the sense that at the time he made the confession he no longer had the ability or capacity to rationally determine his own destiny. Both now and before trial the standard of proof applicable to resolution of this inquiry has been governed by the minimal criterion of proof by a preponderance of the evidence. The burden of satisfying this standard has, however, shifted to Petitioner.

Based upon the record and the testimony presented it is clear that despite the fact the state prevailed in the motions prior to trial and on appeal, the new evidence has shifted the balance slightly and has caused the scale to dip in favor of Petitioner and a finding that the confession was involuntary and harmful.

### FINDINGS OF FACT

To the extent that any Conclusions of Law are deemed to be Findings of Fact, they are hereby incorporated into these Findings of Fact.

### I. THE ARRESTS:

In determining when Petitioner was arrested and upon what basis he was detained in the Richmond City Jail the Court relied, to a large extent, upon microfilm copies of ar-

rest reports and jail records previously admitted as attachments to the deposition of George Neal Newton and referenced and discussed by various other witnesses. In addition, the Court also considered other judicial records pertaining to Petitioner submitted as attachments to the depositions of Janice Rhodes, Bruce Weiss, William Veale, and Diane Needham.[6] After consideration of this evidence the Court makes the following findings of fact:

1. George Neal Newton was formerly a Richmond City Police Officer for a period of over 20 years. Although Mr. Newton was not the jailer in 1976, he did work in the jail within a reasonable time both prior to and following Petitioner's incarceration. His tenure as a jailer provided him with the opportunity to acquire knowledge of the general operation and booking procedures utilized in the Richmond City Jail. After reviewing his videotaped testimony, the Court finds Mr. Newton a knowledgeable and credible witness.

2. The arrest reports and other documents submitted as attachments to Mr. Newton's deposition and previously admitted into evidence by the Court are the most complete and accurate version of these documents currently available. Further, the Court finds that the attachments are credible evidence of the jurisdictional basis and time frame relating to Petitioner's detention in the Richmond City Jail. See (Deposition of George Neal Newton, at pgs. 94–96 (hereinafter "Newton, at pg. ____")).

3. Petitioner, alias James Allen Clay, was first arrested and booked into the Richmond City Jail on burglary charges between 7:15 p.m. and 7:30 p.m. on Wednesday, February 18, 1976. See (Newton, attachment 1); See also (R.T. of 11/18/93 p.m., at pg. 5 [testimony of Petitioner]).

4. The "working copy" of this arrest report documents that Petitioner's true identity

was eventually discovered, that no charges were filed, that he was wanted in Arizona, and that a phone call was received or placed by or regarding Petitioner at 2:30 p.m. on a date unknown.[7] (Newton, at pgs. 13–14).

5. The following day, Thursday, February 19, 1976, Petitioner's identity became known and his California Parole Officer, Larry Harboldt, completed a form entitled "Authorization to Detain" which informally placed a "hold" on Petitioner for violation of the conditions of his parole. There was no testimony or evidence provided as to what was done with this form, nor is there any stamp indicating when or where it may have been filed. See (Newton, attachment 7).

6. On the same day, a teletyped warrant, No. B44028, confirming and formalizing the parole hold was sent to the Richmond Police Department. See (Newton, attachment 8).

7. At 6:00 p.m. on the same day, Petitioner was formally arrested pursuant to this warrant. See (Newton, attachment 6).

8. At the same time Petitioner was also arrested and booked on related burglary charges originating in El Cerrito County. See (Newton, attachment 4).

9. On the same day in Arizona, Lieutenant Douglas G. Steele of the Mohave County Sheriff's Office filed a complaint in the Justice Court for Mohave County, Arizona accusing Petitioner of the theft of the victim's pick-up truck. See Petitioner's Exhibit No. 17 (complaint). At this point, no formal allegation of murder was raised in this or any other document filed in Arizona.

10. At 7:15 p.m. on Thursday, February 19, Petitioner was arrested as a suspect under investigation for a murder occurring in Arizona. See (Newton, attachment 3).

11. Mr. Newton verified that all charges were placed on Petitioner by the evening of February 19, 1976. (Newton, at pg. 89).

6. Any opposition to the admission of these records was waived by Respondents when Ms. Rhodes, the custodian of the records, testified as to their authenticity.

7. Although there was no testimony regarding the phone number written on the police report, it appears that it was more than likely related to

Petitioner's probation officer, Larry Harboldt. Other than one digit a "5" as opposed to an "8", the numbers, especially the last four digits, are identical to the phone number printed on an "Authorization to Detain" signed by Mr. Harboldt. See (Newton, attachment 7).

12. The California burglary charges upon which Petitioner was originally arrested were "dropped" by Richmond City Police Detective Collier when he learned that Petitioner was a murder suspect wanted in Arizona. *See* Exhibit 18 (R.T. of 6/22/76 [voluntariness hearing] at pg. 45); (Newton, at pgs. 18–19 & attachment 5).

13. The original arrest for investigation of murder was effectuated solely by members of the Richmond Police Department.

14. Arizona did not *officially* request that Petitioner be held on murder charges until February 25, 1976, after Petitioner confessed to the crime. *See* (Newton, at pg. 25).

15. Petitioner provided a tape recorded statement/confession to Detective Collier of the Richmond City Police Department beginning at 5:58 p.m. on Wednesday, February 25, 1976, and concluding at 6:45 p.m. on the same day.

16. On the evening of February 25, 1976, after Petitioner provided Detective Collier with the statement at issue, Detective Scott of the Mohave County Sheriff's Office filed a Felony Complaint in the Lake Havasu City Precinct of the Mohave County Justice Court alleging that Petitioner murdered Elmer James Clary. (Deposition of Janice Rhodes, attachment 2, at pg. 6).[8]

17. Subsequently, Justice Clyde A. McCune of the Mohave County Justice Court issued warrant number 25265 authorizing Petitioner's arrest on the charge of murder. *See* (Rhodes, attachment 2, at pgs. 4–5).

18. At 9:02 p.m. on Wednesday, February 25, 1976, the Mohave County Sheriff's Office formally teletyped its request that Petitioner be held on charges of homicide pursuant to warrant number 25265. *See* (Newton, at pgs. 24–25 & attachment 10).

19. On March 1, 1976, 10 days after Petitioner was first arrested for investigation of murder, Detective Collier filed the first formal complaint against Petitioner in the Municipal Court of California alleging that Petitioner was wanted with respect to a fugitive warrant originating in Arizona. *See* (Rhodes, at pg. 8 & attachment 2, at pg. 9).

20. Petitioner did not consult with an attorney or appear before a judicial officer before March 1, 1976. *See* (Rhodes, at pg. 8 & attachment 2, at pgs. 7–8 [Municipal Court Criminal Docket]); *See also* (Deposition of Andrew Schwartz, at pgs. 10, 21 & attachment 1).

21. Petitioner was transferred to the Contra Costa County Jail at Martinez at 4:15 p.m. on March 1, 1976. *See* (Newton, at pgs. 33–34).

22. Petitioner's first opportunity to appear before a judicial officer while represented by counsel occurred on March 3, 1976. At this proceeding Petitioner was represented by public defender, Andrew Schwartz. *See* (Rhodes, at pg. 8 & attachment 2, at pgs. 7–8 [Municipal Court Criminal Docket]); *See also* (Schwartz, at pgs. 10, 21 & attachment 1; Weiss, at pgs. 27–28).[9]

23. On March 8, 1976, Petitioner waived extradition and was ordered transferred to Arizona. *See* (Deposition of Diane Needham, at pg. 14 & attachment 1).

24. Petitioner was released to Mohave County on March 9, 1976. (Newton, at pgs. 33–34).

## II. CONDITIONS OF CONFINEMENT AND PETITIONER'S PHYSICAL CONDITION:

In determining the conditions under which Petitioner was confined, the Court considered Petitioner's testimony, the testimony of three current or former Richmond Police Officers, various exhibits, as well as the testimony of five individuals who were incarcerat-

---

8. Other documents, were submitted as attachments to the deposition of Janice Rhodes. The Court finds these documents true, correct, and complete copies of the judicial records pertaining to Petitioner. *See* (Rhodes, at pgs. 7, 11). The attached documents consisted, in part, of a Fugitive Complaint dated March 1, 1976 signed by Detective Collier; a Municipal Court docket sheet indicating that Petitioner's initial appearance took place on March 1, 1976; and an Indigent's Request for Counsel signed by Petitioner on March 1, 1976.

9. Lieutenant Parrick offered credible testimony that there was no apparent reason why Petitioner was not taken before a judicial officer for appointment of counsel prior to this time.

ed in the Richmond City Jail during approximately the same time as Petitioner. The three current or former police officers were George Neal Newton, Robert Parrick, and Moses Madison York. The five individuals who provided videotaped testimony regarding the conditions at the jail were Thomas Hernandez, Emma Brausch, Billy Sewell, Weston Kevin Sockwell, and William Faulkner. *See* (Exhibits 1-A, 2-A, 3-A, 4-A, and 5-A). It should be noted that other than the state court record and the testimony of Lieutenant Robert Parrick, Respondents offered little evidence relevant to the conditions under which Petitioner was confined.

After consideration of the evidence and testimony noted above, the Court makes the following findings of fact:

25. At the time of the evidentiary hearing in this Court, Robert Parrick was a Lieutenant in charge of the Detective Bureau for the Richmond City Police Department and had been employed by the department for approximately 18 years.

26. At the time Petitioner was detained in the facility, Lieutenant Parrick was a Desk Sergeant with general supervisory responsibility for the jail, property vault, records, photo lab, and communication center. *See* (R.T. of 11/23/93, at pgs. 198–203).

27. Moses Madison York, who at the time of the hearing was employed as a school teacher in Fairfield, California, provided videotaped testimony.

28. In 1976, Mr. York served as a Police Officer with the Richmond Police Department and, more specifically, worked as a jailer in the Richmond City Jail. Mr. York testified that he recalled Petitioner not only because he was wanted for murder in another state, but also because he had several brief conversations with Petitioner. *See* (Deposition of Moses Madison York, at pgs. 5–9).

29. Due to Mr. York's personal experience as a jailer, his recollection of Petitioner, and his general demeanor, the Court finds Mr. York a credible witness.

30. After reviewing the videotaped depositions and transcripts of the five witnesses, Hernandez, Brausch, Sewell, Sockwell, and Faulkner (hereinafter "Detainees") the Court

finds that all but one of the witnesses were convicted or detained on relatively minor charges or infractions. Further, the Court finds that all of the Detainees were incarcerated in the jail during the same time period as Petitioner. *See* (Exhibits 1-A, 2-A, 3-A, 4-A, and 5-A [depositions]).

31. All the Detainees testified substantially consistent with one another regarding the conditions in the jail and the attitude or demeanor of the Richmond City Police.

32. Much of the substantive testimony regarding the operational and hygienic aspects of the jail were, in varying degrees, confirmed by Lieutenant Parrick.

### A) Jail Facility:

33. The City of Richmond, California is located in Contra Costa County in what is typically referred to as the "Bay Area".

34. At the time of Petitioner's incarceration, the Richmond City Jail was located on the second floor of the "Hall of Justice" which also served as headquarters for the Richmond Police Department.

35. At the time of Petitioner's incarceration, the Richmond City Jail was officially classified as a "type I" facility by the State of California. *See* (Newton, at pg. 37 & attachment 16; York, at pgs. 13–14).

36. A "type I" facility is generally authorized to house individual prisoners for not more than 48 hours, excluding weekends and holidays. *See* Exhibit 8 ([Certified Letter and California Administrative Code, Division I, Chapter I, Subchapter 4, Article I, Section 1006, Subchapter (b)(3)]).

37. It was a routine and common practice to transfer persons housed in the Richmond City Jail to the County Jail at Martinez within approximately 48 hours if they were not released on their own recognizance.

### B) General Environment:

38. Supervision of the jail and its prisoners was the responsibility of the jailer on duty at the time.

39. Each jailer was accorded broad discretion with respect to all facets of prisoner management during his shift.

40. The jail facilities were spartan and were generally dirty and ill maintained. *See* (Sockwell, at pg. 10; Sewell, at pg. 8; Hernandez, at pgs. 9, 15; York, at pgs. 21–22, 63).

41. The cells in which prisoners were housed were littered with substantial amounts of refuse, spital, vomit, cigarette butts, old food containers and toilet paper. *See* (Sewell, at pgs. 8, 18; Hernandez, at pg. 15).

42. Custodians employed by the City of Richmond were responsible for cleaning the entire Hall of Justice, including the jail facilities. At most, however, the custodians had access to the cells twice per day, primarily at meal times, when the prisoner would be moved to "day cells". *See* (Newton, at pg. 74). It would appear, however, that the cleaning schedule was not rigidly enforced. *See* (Sockwell, at pg. 10).

43. While incarcerated in the jail, prisoners were routinely denied access to shower facilities and were denied the opportunity to perform basic hygienic tasks such as brushing their teeth or changing their clothes. *See* (Sockwell, at pgs. 8, 23; Sewell, at pg. 9; Brausch, at pg. 10; Newton, at pgs. 79–80).

44. The plumbing within the jail was in poor condition and both the Detainees and police officers confirmed that fresh running water was not always readily available either for showers or consumption. *See* (Brausch, at pg. 7; R.T. of 12/2/93 [testimony of Lt. Parrick] at pgs. 67, 215).

45. Although each individual jailer had the discretion to provide showers to a prisoner, the possibility appears to have been more theoretical than practical because the jailers had no towels, soap, or any of the other necessities. (York, at pg. 28).

46. In addition to being generally unsanitary, the jail was also poorly heated. Although the jail shared the central hot water heating system with the rest of the building,

there was ample testimony that it was significantly colder in the jail than in the booking area adjacent to the jail. *See* (York, at pg. 24; Hernandez, at pg. 49; Sewell, at pg. 21).

47. The design and concrete construction of the jail enhanced the cold and damp environment and rendered the ventilation system incapable of adequately compensating for the rapid climatic changes often occurring in the "Bay Area" during the winter months.

48. The jailers would frequently open the windows in the jail to provide for additional ventilation, regardless of the weather conditions. (Newton, at pg. 68; York, at pg. 64; R.T. of 11/23/93 [Lt. Parrick] at pgs. 225–26; Hernandez, at pg. 12).

49. During the winter months the temperatures within the facility could get as low as the thirties or forties at night. *See* (York, at pgs. 23–25, 64; Brausch, at pg. 11; Sockwell, at pg. 28; Sewell, at pg. 10; Hernandez, at pgs. 30, 40).

50. The temperatures in Richmond, California between February 18, 1976 and February 25, 1976, varied between highs of 56–68 degrees and lows between 39–49 degrees. *See* Petitioner's Exhibit 9 (National Climatic Data Center records for Richmond, California).

51. Prisoners typically remained in their own clothes while incarcerated and were issued one wool blanket, similar to those used in the military. Prisoners would utilize the same blanket throughout the duration of their detention. *See* (Newton, at pg. 71).

52. Although prisoners could request additional blankets, it was at the sole discretion of the jailer on duty at the time as to whether additional blankets would be issued. It would also appear that such requests were often ignored. (Newton, at pg. 71; Brausch, at pg. 11; Sockwell, at pgs. 26–27).

53. There was conflicting testimony provided by the witnesses as to the size of these blankets, however, it appears that they may be generally described as smaller than a typical blanket made for a full-sized [10] bed.

---

**10.** The testimony conflicted as to whether the blankets provided were "full-sized" blankets or half blankets. No relative sizes or descriptions

of what constituted a "full blanket" were established. Upon review, therefore, the Court finds that the various statements indicate that the

54. The blankets were old and beginning to suffer the effects of age, becoming tattered and generally dirty. *See* (R.T. of 11/23/93 [Lt. Parrick], at pg. 214; Faulkner, at pg. 8; Hernandez, at pgs. 10–11; Sewell, at pg. 9).

55. Prisoners were fed two "T.V. type" dinners twice daily. One at approximately 6:00 in the morning and one at approximately 6:00 in the evening. *See* (Newton, at pg. 64; Sewell, at pg. 6; Sockwell, at pgs. 6–7; Hernandez, at pg. 7; Brausch, at pg. 7; Faulkner, at pg. 8; York, at pg. 32; R.T. of 11/23/93 [Lieutenant Parrick], at pgs. 227–230).

56. The dinners were small and generally inadequate in both size and nutritional value. *See* (Sewell, at pg. 7; Sockwell, at pgs. 7–8; Hernandez, at pg. 8; Brausch, at pg. 8; Faulkner, at pgs. 8–9; York, at pgs. 31, 60, & 75; R.T. of 12/2/93 [Lieutenant Parrick–Cross], at pg. 60); Exh. 27–Jail Evaluation Form, ¶ 9(b) at pg. 7 (Diet not sufficiently nutritious).

57. Although prisoners typically remained in their street clothes, paper suits were provided to any prisoner whose clothes were confiscated for evidentiary purposes.

58. Once an individual was issued a paper suit, the prisoner remained in that suit for the duration of his stay at the jail and would be issued a new suit only in the most exceptional circumstances. *See* (York, at pgs. 26–27; Sockwell, at pg. 15).

59. The suits were zip-up style and were constructed of a nylon/paper substance.

60. Each suit was about as thick as a paper grocery bag, and the uncontradicted evidence demonstrates that the suits provided little insulation from the cold and would tear with even normal body movements. (R.T. of 6/22/76 [voluntariness hearing] at pg. 54; Sockwell, at pgs. 13–14; Hernandez, at pgs. 11–12; York, at pgs. 26–27).

61. There were no medical or nursing facilities available at the jail. Furthermore, absent extreme and visible injuries warranting immediate emergency treatment, prisoners did not receive medical assistance and were required to await their transfer to the county jail. (York, at pg. 32; Hernandez, at pgs. 13–14; Sockwell, at pg. 12). It should be noted, however, that many of these amenities or services were lacking solely because most prisoners were transferred or released within 48 hours.

## C) Petitioner's Experiences Prior To Arrest And In Custody: [11]

62. Petitioner was familiar with institutional confinement and was released from San Quentin prison in December 1975. (R.T. of 11/23/93 at pg. 5). Upon being released, Petitioner violated the conditions of his parole with his departure from the Bay Area to live a life of solitude in the mountains. (R.T. of 11/23/93 at pgs. 5–15).

63. Petitioner was arrested on February 18, 1976, and was detained in the Richmond City Jail for a period of six days, 22½ hours before providing a taped confession to Detective Donald Collier of the Richmond City Police Department on February 25, 1976.

64. Throughout his incarceration in the jail, Petitioner was aware, from both personal observation and informal gossip, that the jail was a 48 hour facility. *See e.g.* (R.T. of 11/18/93, at pg. 52).

65. Petitioner was issued one blanket and was allowed to remain in his civilian attire throughout the evening of February 18, 1976, and for most of the following day.

66. After Collier identified Petitioner as the suspect in an Arizona homicide, Petitioner was again arrested, removed from his original cell, and placed in solitary confinement in what has been referred to as the "trustee's cell."

67. The trustee's cell was located somewhat closer to the booking area than a majority of the cells and was of a sufficient size to comfortably house one prisoner.

---

blankets were not torn in half, however, they were also of a smaller size than would typically be found in an average household.

11. Much of the facts relating to Petitioner's personal experiences while incarcerated in the jail were derived from his own largely uncontradicted testimony. Thus, repetitious citations to the record are omitted.

68. The trustee's cell was more spartan and less frequently cleaned that the other cells. *See* (Newton, at pg. 106) (noting that any cleaning occurred only when prisoners were transferred to the "day cells" at meal times because the custodians could not be placed at risk or have contact with the prisoners and that a suspected murderer would have remained in his cell to eat because of the severity of his charges); *See also* (R.T. of 6/22/76 [voluntariness hearing] at pg. 125).

69. There is no dispute that after being placed in the trustee's cell, Petitioner's clothes were confiscated for evidentiary purposes and he was issued a paper suit and paper slippers. *See* (R.T. of·6/22/76 [voluntariness hearing] at pg. 103; York, at pg. 27).

70. After repeated requests, Mr. York provided Petitioner an additional blanket. The blanket, however, was in poor condition and was approximately one-half the size of the blankets typically provided.

71. Prisoners provided only one or two blankets and clothed in nothing more than a paper suit would be uncomfortably cold when the temperatures reached the 30's or 40's as they did during Petitioner's detention. *See* (R.T. of 6/22/76 [voluntariness hearing] at pg. 103; York, at pgs. 34, 66).

72. The paper suits provided little protection from the elements and, in light of the conditions present in the jail and the weather at that time, the Court finds that Petitioner was uncomfortably cold and repeatedly noted his discomfort and requested additional blankets. *See* Exhibit 18 (R.T. of 6/22/76 [voluntariness hearing] at pgs. 39, 52–54, 73, 103; York at pg. 34).

73. Petitioner was provided only one paper suit which became torn in the groin area. Although Petitioner testified that he suffered great embarrassment after walking in front of two women while being escorted to his interview with Detective Scott, the evidence was less than conclusive as to the severity of the tears, especially considering that Petitioner wore the paper suit, at most, one day from the 19th to the 20th.

74. After being confined in the cell for a period of time, Petitioner requested the opportunity to shower. (R.T. of 6/22/76 [voluntariness hearing] at pg. 123; R.T. of 11/18/93 at pg. 42). Petitioner's request was, however, denied thereby adding to his discomfort and odorous nature. *See* (R.T. of 11/23/93 at pg. 236; York, at pg. 29).

75. Lieutenant Parrick stated that the shower in the trustee's cell had, to the best of his knowledge, been turned off, perhaps in part due to problems with plumbing and drainage. (R.T. of 12/2/93 at pg. 67; R.T. of 11/23/93 at pg. 215).

76. Petitioner voiced his dissatisfaction with the quantity of the food served to Detective Collier. *See* (R.T. of 6/22/76 [voluntariness hearing] at pg. 61).

77. In addition to dealing with the spartan conditions prevalent in the jail, Petitioner also suffered from personal maladies including chronic sinusitis and related minor respiratory ailments.

78. Due to his condition, Petitioner, on a daily basis, utilized what are now common over-the-counter antihistamines and decongestants. Moreover, to a limited extent, Petitioner has become somewhat dependent upon these medications.

79. While incarcerated Petitioner requested access to his previously confiscated medicine, or in the alternative, medical treatment. Petitioner was informed, however, that his own medicine could not be given to him pursuant to jail regulations and that no medical facilities were available. *See* (R.T. of 6/22/76 [voluntariness hearing] at pg. 103; R.T. of 11/23/93 at pg. 193; York, at pg. 35).

80. Several days after being deprived of his medication Petitioner began to suffer from increasingly severe headaches and congestion. These symptoms were further aggravated by the cold and drafty environment. *See* (R.T. of 11/18/93 at pgs. 15–16, 24, 41 [Doctor McKinley]; R.T. of 11/17/93 [Doctor Bendheim] at pg. 50).

81. Other than requesting his own medication, Petitioner did not request any additional medical treatment.

82. On the day Petitioner provided his statement he testified that he felt very ill:

[M]y biggest problem was the headaches from the congestion. I had a cold, and I

was really congested. Periodically over the years, what I thought was bronchitis, is when I get congested, and I get a little short of breath. It's like an asthma attack, and it's just really brief, but you just can't catch your breath ... concerned about being cold, because I can't get out of there. Going to get even more sick. That's obvious. Can't get medication. It'd be hard for me to describe the degree of how I was sick.

(R.T. of 11/17/93 at pgs. 59–60).

83. Petitioner provided medical evidence through the testimony of Doctor William McKinley, Jr., a physician currently employed by the Department of Corrections at the Special Management Unit at the Arizona State Prison at Florence, that, based upon Petitioner's records and Doctor McKinley's personal observations after treating Petitioner, it was likely that Petitioner's nose would have become occluded, he would have suffered from postnasal drainage, possibly upper respiratory problems, headaches, and swelling. (R.T. of 11/18/93 at pgs. 21–22). Doctor McKinley further testified that although Petitioner would have been exceptionally miserable, the symptoms would not have, for example, "affected his capacity to swing a mop or push a broom." (R.T. of 11/18/93 at pg. 23).

84. Petitioner's sinus condition was not, in itself, incapacitating, nor did it render Petitioner mentally incapable of reasoning. The contemporaneous tape recording of Petitioner's confession discloses that while Petitioner repeatedly cleared his throat, he did not sound chronically ill and his discussion of the facts was coherent and logical.

### III. POLICE ACTIONS:

#### A) Collier's Actions *Prior* to Detective Scott's Interview:

85. Donald Lee Collier was formerly a police detective employed by the City of Richmond Police Department.

86. Mr. Collier appeared at the evidentiary hearing through his testimony given at the state court voluntariness hearing, at trial, in his deposition conducted in 1990, as well as his police report, which reveal inconsistencies and contradictions in his recollection of events and his testimony impairing his credibility.

87. Collier's first contact with Petitioner occurred at approximately 1:30 p.m. on February 19, 1976, when Collier, a burglary detective, went to the jail to investigate a burglary report involving Petitioner. At that time, Petitioner's true identity was unknown. (R.T. of 6/22/76 [voluntariness hearing] at pg. 14).

88. Before questioning Petitioner, Collier Mirandized him utilizing a standard rights card.

89. Petitioner responded to Collier's questions by stating "There is not much to say." (R.T. of 6/22/76 at pg. 16).

90. Petitioner knew he had to go to court to have an attorney appointed and, therefore, believed there was no point in stating his request to Collier. See (R.T. of 11/18/93, at pgs. 62–63). Petitioner did, however, invoke his right to remain silent.

91. Petitioner failed to request counsel during his interview with Detective Scott on the following day, the Court finds that Petitioner merely invoked his Fifth Amendment right to remain silent and did not request counsel.

92. Both Petitioner and Collier confirmed that Petitioner was then escorted to the detective bureau by Collier where he was photographed and interrogated.

93. The interrogation was not a typical question and answer session, rather, Detective Collier's supervisor questioned Petitioner regarding his identity while he was being photographed by Collier. In addition, the supervisor made intimidating statements in which he alluded that Petitioner may have been involved in other burglaries or that he may have been the serial killer at large at that time in the Bay Area. See (R.T. of 6/22/76 at pgs. 92–95).

94. These statements were made for the purpose of scaring Petitioner in the hopes that he would divulge his identity to avoid being accused of multiple homicides. It is clear, however, that Petitioner understood this at the time it occurred and that he was

only minimally intimidated by these tactics at this specific time.

95. At some point both Detective Collier and his supervisor told Petitioner that he would not leave the Richmond Jail until he was properly identified and they knew what crimes he committed. (R.T. of 11/23/93 at pgs. 68–71; Collier depo., at pgs. 133–34).[12]

96. Despite these tactics, however, Petitioner did not make any statements or identify himself at that time.

97. Collier became more suspicious of Petitioner's identity when he was informed by the jailer that Petitioner had no identification when arrested. (R.T. of 6/22/76 at pg. 17). Collier, therefore, inspected Petitioner's effects and from various photographs and some winter clothes surmised that Petitioner may have recently been in the Lake Tahoe area.

98. At approximately 3:15 p.m. on February 19, 1976, Collier contacted the Tahoe police to inquire whether they were looking for anyone matching Petitioner's description. (R.T. of 6/22/76 at pg. 18).

99. The Tahoe police informed Collier that they had been notified on February 16, 1976 that one James Arnett, a.k.a. James Farmer, a.k.a. James Clay, may have been involved in a murder occurring near Lake Havasu City, Arizona. Upon receiving this information Collier contacted the Mohave County Sheriff's Office. (R.T. of 6/22/76 [voluntariness hearing] at pg. 19).

100. At an unspecified time, Collier received a phone call from the Mohave County Sheriff's Office informing him that their suspect had a tattoo of a "flying eagle" on his left shoulder. Upon receiving this information, Collier and several other officers inspected Petitioner's shoulder and confirmed the existence of the tattoo. At this point, Collier informed Petitioner that he was under arrest for investigation of a murder occurring in Arizona.

101. Collier did not again advise Petitioner of his *Miranda* rights and merely placed Petitioner in the trustee's cell. (R.T. of

6/22/76 [voluntariness hearing] at pgs. 20, 63–64).

102. A short time later, an identification technician took photographs, finger nail scrapings, and hair samples from Petitioner's person.

103. Mr. Newton testified that the arrest reports submitted as attachments to his deposition indicated that no charges were filed in relation to the California offenses. Mr. Newton could not, however, determine when those charges were dropped.

104. Although not noted upon the arrest reports, Collier stated that he dropped the burglary charges as soon as he learned that Petitioner was wanted in Arizona. (R.T. of 6/22/76 [voluntariness hearing] at pg. 45).

105. Collier had no further contact with Petitioner on February 19, 1976.

**B) Detective Scott Interview:**

106. Collier's next contact with Petitioner occurred around 8:00 p.m. on the following day, February 20, 1976, when Detective Scott of the Mohave County Sheriff's Office arrived to question Petitioner regarding the Arizona homicide.

107. Upon Detective Scott's arrival, Petitioner was taken to an interview room where Detective Scott advised him of his *Miranda* rights.

108. Detective Scott proceeded to inform Petitioner that he was suspected of committing a murder and relayed to Petitioner the general facts of the crime as they were known. (R.T. of 6/22/76 [voluntariness hearing] at pgs. 22–23, 69–71; R.T. of 11/17/93 at pgs. 33–34).

109. Detectives Scott and Collier questioned Petitioner about the homicide, at which time Petitioner invoked his *Miranda* rights, i.e., he invoked his right to remain silent, but never requested an attorney.

110. Petitioner did, however, request information regarding his probable extradition to Arizona and attempted to negotiate for the dismissal of the California charges in ex-

---

12. Detective Collier's deposition was taken in 1990 and was submitted as Petitioner's Exhibit 19 at the evidentiary hearing. For convenience, however, the Court shall designate such cites as "Collier depo.".

change for his waiver of extradition proceedings.

111. Although Petitioner testified at the evidentiary hearing that he could not recall any further questioning after he invoked his rights, Detective Collier indicated that Detective Scott may have continued his questioning. Collier asserted that Scott continued to question Petitioner, but stated that Petitioner merely continued to assert his rights, refused to talk, and provided generally useless information. (Collier depo., at pgs. 79–80).

112. In addition to conducting additional questioning, other conversations also occurred. Apparently while extradition matters were being discussed a conversation was initiated regarding whether Arizona employed the death penalty as a mode of punishment. There was substantial dispute, however, as to who initiated this discussion. Petitioner asserts that Detective Collier unexpectedly initiated this discussion as a means of intimidating Petitioner. (R.T. of 11/18/93 at pgs. 33–37). Detectives Collier and Scott, however, assert that Petitioner questioned whether the death penalty existed in Arizona in the context of discussing his potential extradition. (R.T. of 6/22/76 [voluntariness hearing] at pg. 71; Collier depo., at pg. 87).

113. There is no documentation or transcript of these prior conversations. The only evidence is the testimony of Petitioner and Detectives Collier and Scott. What is persuasive to the Court, however, is the virtual lack of any reference to this topic in the transcript of the tape recorded interview conducted immediately following these discussions. See (Exhibit 23).

114. A review of the transcript of the interview discloses that Detective Scott was careful to note he and Petitioner had engaged in prior conversations and that Petitioner agreed to sign a waiver of extradition if the California charges were dropped.

115. The Court finds it unlikely that Detective Scott would have failed to note Petitioner's inquiry into the possible mode of punishment had such an inquiry been made, considering this was a murder case and such statements or inquiries would be highly incriminating. Moreover, Detective Scott specifically noted that the only thing Petitioner wanted to know was whether he was being extradited to Arizona. See (Exhibit 23, at pg. 2).

116. The Court finds Petitioner's version of events persuasive and that Detective Collier initiated the conversation regarding the death penalty.

117. Petitioner then provided a brief taped statement regarding the Arizona homicide, in which he again invoked his right to remain silent. Upon invoking his rights, Detective Scott terminated the taped interview. (R.T. of 11/18/93 at pgs. 33–37; R.T. of 6/22/76 at pg. 23; Collier depo., at pg. 79).

118. There also appears to be some confusion between Detectives Scott and Collier as to which of them had jurisdiction over Petitioner. Detective Scott specifically stated that Collier was present during the February 20th. interview because Petitioner "was his prisoner. He [Collier] had picked him up. He was in his custody, not in mine." (R.T. of 6/22/76 [voluntariness hearing] at pg. 82). Detective Collier, on the other hand, stated that "the case in my mind was all in the hands of Scott. It was committed in his area, his jurisdiction. He made the trip. He was their guy." (Collier depo., at pg. 83); See also [Findings of Fact, Nos. 13 & 14].

119. As noted previously, the Court finds that Petitioner was arrested solely upon Collier's authority initiated by an informal request from Scott.

C) Collier's Actions Subsequent to February 20, 1976:

120. At this point it appears Collier began to take advantage of Petitioner's incarceration in the jail and may have through the practice of "stacking charges" orchestrated Petitioner's continued detention in that facility without transfer or an arraignment.

121. Collier acknowledged that the 48–hour rule was subject to potential abuse and his explanation illuminates the inherent problems with technically legal detentions that arguably involve unnecessary delays in arraignment. "The whole 48–hour thing," if I

**1530**

stacked all the charges, I probably could have kept him in Richmond City Jail for two weeks, different cases, different jurisdictions. *See* (Collier depo., at pgs. 135–36).

122. Lieutenant Parrick also acknowledged the possibility of abuse of the 48–hour rule through what is referred to as the "stacking" of charges. He stated that technically you could continuously drop charges and add new ones and keep someone in jail continuously without taking them before a judicial officer. "[T]echnically you can do that, but the judges really frown on that. It's, you know, not good business." (R.T. of 12/2/93 at pgs. 92–93).

123. There was other evidence of possible abuse. For example, although unsure as to how he acquired the information, i.e. whether directly from Collier or via his supervisor, Lieutenant Parrick recalled Collier *requesting* Petitioner's continued incarceration in the jail. (R.T. of 11/23/93 at pgs. 231–32; R.T. of 12/3/93 at pgs. 69–71).

124. Collier next contacted Petitioner on the following day, February 21, 1976. (R.T. of 6/22/76 [voluntariness hearing] at pg. 23).

125. It should be noted that there was some question as to whether there was a national holiday occurring during Petitioner's incarceration, thereby affecting the delay between Petitioner's arrest and arraignment.

126. President's Day is celebrated each year on the third Monday in February. *See* 5 U.S.C.A. § 6103.

127. In 1976, President's Day was celebrated on Monday, February 16, 1976. Thus, no holiday occurred which would have affected Petitioner's detention or delayed his arraignment.

128. Collier testified that he saw Petitioner less than once a day and had minimal contact with him prior to the time Petitioner chose to confess. Collier later contradicted himself, however, stating that he checked on Petitioner almost on a daily basis. *See* (R.T. of 6/22/76 at pgs. 60–61; Collier depo., at pgs. 98–100). Petitioner, on the other hand, as-

serts that Collier visited him every day and sometimes several times a day prior to the time he provided the statement. *See* (R.T. of 6/22/76 [voluntariness hearing] at pg. 105).

129. On balance, the most persuasive evidence is that Collier visited Petitioner on numerous occasions and engaged Petitioner in conversations or discussions for the purpose of eliciting incriminating responses.

130. Collier purposely acted friendly to Petitioner for the purpose of enhancing their rapport and, thereby, possibly obtaining a statement from Petitioner. (Collier depo., at pgs. 122–23).

131. All of these meetings concluded with Collier informing Petitioner that if he wished to speak to him he should request the jailer to get him at any time.

132. Petitioner was not Mirandized prior to each meeting. *See* (R.T. of 6/22/76 [voluntariness hearing] at pgs. 58–59; Collier depo., at pg. 93).

133. Petitioner maintained his silence with respect to the Arizona homicide.

134. Although Petitioner testified at the voluntariness hearing that the conversations were general discussions that did not involve the crime, he also stated that Collier would repeatedly relay or summarize the facts or evidence known and attempt to have Petitioner "fill in the pieces".

135. A fair interpretation of these statements, in the context of other related testimony, is that the talks were congenial in nature and did not occur in the typical interrogation setting, but were nonetheless specifically designed to elicit additional facts directly or indirectly pertaining to the crime. *See* (R.T. of 11/23/93 at pgs. 193–96; R.T. of 11/18/93 at pgs. 45–48).[13]

136. Throughout his detention, Petitioner repeatedly questioned Collier regarding when he would be allowed to appear in court.

137. Collier provided Petitioner no information regarding the proposed length of Pe-

13. For example, Arnett testified as follows: "[H]e [Collier] must have got some more information. That prompted him to come up more often. Because I noticed that every time he come up—came up, he had something new to say. So he's getting some information from somewhere." (R.T. of 11/18/93 at pg. 45).

titioner's incarceration and was evasive regarding when Petitioner would be arraigned.

138. The lack of information served to add to Petitioner's feelings that he would be held indefinitely in the Richmond City Jail because Petitioner knew that most individuals were taken before a judicial officer within 48 hours.

139. Petitioner believed that Collier was denying him access to the courts, and would continue to do so unless and until Petitioner cooperated. *See* (R.T. of 11/18/93 at pgs. 52–57). As Petitioner stated:

I made a determination I had to get out of there. The only way I was going to get out of there was talk to him. That was it. So I made that decision that was the only way I was going to get out of there.

(R.T. of 11/18/93 at pg. 61).

I talked to him to get out of that—to get to the county jail where I could get some treatment, to where I could get to court. They told me repeatedly I've got these rights. I got a right to a lawyer, but when I asked Scott—I asked Collier about the lawyer, he says when you get to court. When I asked him when I'm going to court, he doesn't know. He's very evasive.

(R.T. of 11/18/93 at pg. 67).

140. On the afternoon of February 25, 1976, Detective Collier met with Petitioner. There is some dispute, however, as to whether Petitioner requested the meeting or Detective Collier initiated the contact. Collier stated that Petitioner requested the jailer to contact him. *See* (R.T. of 6/22/76 [voluntariness hearing] at pg. 26; R.T. of 7/22/76 [trial] at pg. 43; Collier depo., at pg. 107). Petitioner, however, stated that Collier visited with him earlier that day, told him to contact the jailer if he needed anything, then later again visited Petitioner which precipitated the confession. (R.T. of 6/22/76 [voluntariness hearing] at pgs. 111–12). Petitioner, however, altered his testimony at the evidentiary hearing stating that he did request to

see Collier. *See* (R.T. of 11/18/93 at pgs. 60–61).

141. Regardless of who actually initiated this meeting, it appears clear that Petitioner's original intent was to ask Collier for a toothbrush. Upon being informed of this request either by Petitioner directly or via the jailer, Collier purchased a toothbrush, returned to the jail, requested that Petitioner be removed from his cell, and then accompanied Petitioner to a washroom.

142. After Petitioner brushed his teeth, Collier again informed him that he should contact him if he wanted to talk. At that point, Petitioner informed Collier that he was prepared to make a statement involving the Arizona homicide. *See* (R.T. of 6/22/76 [voluntariness hearing] at pg. 27; Collier depo., at pg. 107).

143. Upon being told that Petitioner wished to make a statement, Collier responded by informing Petitioner that it was late in the day and he was not interested in hearing another denial of Petitioner's involvement in the crime. (R.T. of 6/22/76 [voluntariness hearing] at pgs. 27–28; R.T. of 11/18/93 p.m. at pg. 62).

144. Collier, Petitioner, and Parrick entered the interview room at approximately 5:45 p.m. at which time Petitioner was read his *Miranda* rights and then provided a detailed statement admitting his involvement in the homicide.[14]

### D) Effect of Collier's Actions and Detention:

145. Petitioner presented psychological and sociological evidence of the effect the conditions and duration of his confinement coupled with Collier's actions had upon his will to resist.

146. Doctor Otto L. Bendheim, a psychiatrist with over fifty years of experience and Richard Ofshe, Ph.D., a sociologist, testified on behalf of Petitioner.[15]

---

14. Parrick testified that no promises or threats were made by himself or Collier and stated that Petitioner requested the frequent pauses noted on the tape. Parrick stated, however, that he had no knowledge or information regarding the conversations occurring between Petitioner and

Collier prior to this time. (R.T. of 12/2/93 at pg. 20).

15. For a complete recitation of the qualifications of both experts Petitioner submitted their curriculum vitae. *See* Exhibits 10 & 11.

147. Both experts were of the opinion that Petitioner's confession was not given voluntarily and that his will was overborne.

148. A review of Doctor Bendheim's testimony reveals that he based his determination primarily upon his impression of the conditions under which Petitioner was confined, as well as the fact that California subsequently reclassified the jail as an 8–hour facility.

149. Doctor Bendheim stated that such conditions could have the ability to not only aggravate physical maladies, but that five days of confinement under such conditions could also "break down" one's mental resistance. (R.T. of 11/17/93 at pgs. 52–62, 104).

150. Doctor Bendheim also opined, however, that Petitioner was "street-wise" and that such experience would tend to reduce the psychological feelings of coercion. (R.T. of 11/17/93 at pgs. 63, 82).

151. When questioned, Doctor Bendheim stated that his opinion or conclusions would change if the reason California reclassified the jail involved administrative decisions or considerations other than, or in addition to humanitarian concerns.[16] (R.T. of 11/17/93 at pg. 81).

152. Although Doctor Bendheim was a credible and informative witness, in light of the nature and basis of his testimony, his conclusions are not dispositive as to whether Petitioner's will was overborne and is merely persuasive evidence that the erosion of Petitioner's will had likely begun.

153. Doctor Ofshe is a professor of sociology at the University of California at Berkeley. Doctor Ofshe testified that his area of expertise involves social and interpersonal influence, especially the sociological dynamics involved in police interrogations. (R.T. of 11/17/93 at pgs. 109–115).

154. Respondents argued that Doctor Ofshe was not qualified to testify both due to a lack of experience and because he would inevitably be discussing psychological aspects of the voluntariness inquiry. The Court ruled, however, that while Doctor Ofshe's experience may impact upon the weight ac-

corded his testimony, it did not impact upon his qualifications to testify. (R.T. of 11/17/93 at pg. 130).

155. After reviewing various portions of the record and the depositions of several witnesses Doctor Ofshe concluded that Petitioner's confession was elicited through a coercive strategy employed by Detective Collier. (R.T. of 11/17/93 at pg. 143).

156. Doctor Ofshe opined that Collier's strategy was to allow Petitioner to believe that only by confessing to Collier would his oppressive and apparently interminable confinement end.

157. Doctor Ofshe stated that although Petitioner demonstrated some sophistication with the law, individuals like Petitioner who become accustomed to custodial confinement are often highly sensitive to even minor changes in their environment; changes that would seem almost insignificant to average individuals.

158. Upon consideration of the expert testimony proffered, the Court finds that Petitioner was "street-wise" and generally familiar with police procedures.

159. Even according even minimal weight to Petitioner's expert testimony it becomes apparent that Petitioner became concerned when he was not arraigned or transferred to the county jail within the typical 48–hour time period. Moreover, considering Petitioner's personal habits, the deprivation of his medicine, and Collier's repeated contacts even after invocation of his rights, it is likely that Petitioner's capacity to resist began to deteriorate.

### CONCLUSIONS OF LAW

To the extent that any Findings of Fact are deemed to be Conclusions of Law, they are hereby incorporated into these Conclusions of Law.

■ 1. Involuntary confessions in state criminal cases are inadmissible under the 14th Amendment. *Blackburn v. Alabama,* 361 U.S. 199, 207, 80 S.Ct. 274, 280, 4 L.Ed.2d 242 (1960).

16. Neither Petitioner nor Respondents provided any evidence elaborating upon the basis of California's decision to reclassify the Richmond City Jail.

■ 2. Whether a confession was voluntarily given, however, is a legal question warranting de novo consideration in a federal habeas proceeding. *Miller v. Fenton*, 474 U.S. 104, 112, 106 S.Ct. 445, 450–51, 88 L.Ed.2d 405 (1985); *Collazo v. Estelle*, 940 F.2d 411, 416 (9th Cir.1991) (en banc) (noting that federal courts are not bound by state court determinations of voluntariness), *cert. denied*, 502 U.S. 1031, 112 S.Ct. 870, 116 L.Ed.2d 776 (1992).

■ 3. To determine the voluntariness of a confession, the Court must consider the effect that the totality of the circumstances had upon the will of the petitioner. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 226–27, 93 S.Ct. 2041, 2047–48, 36 L.Ed.2d 854 (1973).

■ 4. At a voluntariness hearing occurring before trial, the prosecution must prove by a preponderance of the evidence that a confession is voluntary. On collateral review, however, it is the petitioner who must prove the statements involuntary by a preponderance of the evidence. *Miller v. Fenton*, 796 F.2d 598, 604 (3d Cir.) (on remand from 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405), *cert. denied*, 479 U.S. 989, 107 S.Ct. 585, 93 L.Ed.2d 587 (1986).

■ 5. Prior to deeming a confession involuntary, a court must find that the police engaged in some form of coercive activity. *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 521–22, 93 L.Ed.2d 473 (1986); *See also Derrick v. Peterson*, 924 F.2d 813, 818 (9th Cir.1990), *cert. denied*, 502 U.S. 853, 112 S.Ct. 161, 116 L.Ed.2d 126 (1991) (noting that age and mental capacity of the defendant became relevant to the voluntariness inquiry only if coercive police conduct was present).

6. Whether coercive police activity occurred is a question subject to de novo review. *Derrick v. Peterson*, 924 F.2d at 818.

7. Petitioner contends that the police engaged in coercive conduct by improperly delaying his arraignment while subjecting him to onerous conditions of confinement. Fur-

ther, Petitioner contends that the police willfully violated his *Miranda* rights and continuously questioned him about the murder. The Court will initially address whether these arguments objectively constitute police coercion.

8. If the Court finds coercive conduct, it will then determine whether Petitioner's confession was involuntary under the totality of the circumstances present in this case, including Petitioner's personal susceptibilities.

9. If the Court concludes that the confession was involuntary, it will then determine whether the statement's admission was nonetheless harmless.

## I. DID THE POLICE ENGAGE IN CO-ERCIVE CONDUCT? [17]

### A. Delay In Arraignment And Conditions Of Detention:

■ 10. Petitioner contends coercive police conduct exists because he was purposefully detained in the Richmond City Jail under oppressive conditions and in violation of state law. Petitioner contends that Detective Collier wilfully violated Section 825 of the California Penal Code and impinged upon his due process rights for the sole purpose of keeping Petitioner in his custody with the hopes of eliciting a confession. Moreover, Petitioner cites to *Mallory v. United States*, 354 U.S. 449, 455, 77 S.Ct. 1356, 1359–60, 1 L.Ed.2d 1479 (1957) and related federal authority pertaining to the admissibility of confessions and pre-arraignment delay. *See* 18 U.S.C. § 3501.

■ 11. Petitioner's reliance upon federal statutes and case law is unpersuasive. Petitioner was arrested by state authorities and detained solely upon state charges. "As long as a person is arrested and held only on state charges by state or local authorities, the provisions of § 3501(c) are not triggered." *United States v. Alvarez–Sanchez*, —— U.S. ——, ——, 114 S.Ct. 1599, 1604, 128 L.Ed.2d 319 (1994).

---

**17.** It should be noted that although Fourth Amendment challenges such as delay in arraignment would not independently entitle Petitioner

to habeas relief, they may be considered in relation to the totality of the circumstances.

■ 12. Petitioner also contends, however, that his detention violated state law.[18] Section 825 of the California Penal Code provides, in part, as follows:

The defendant must in all cases be taken before the magistrate without unnecessary delay, and, in any event, within two days after his arrest, excluding Sundays and holidays; provided, however, that when the two days prescribed herein expire at a time when the court in which the magistrate is sitting is not in session, such time shall be extended to include the duration of the next regular court session on the judicial day immediately following.

Petitioner argues that because all charges were placed no later than 7:15 p.m. on Thursday, February 19, 1976, and he was not arraigned until March 1, 1976, his detention and the resulting confession were unlawful.

13. Pursuant to the provisions of Section 825 quoted above, 24 of the 48 hours allotted for pre-arraignment custody expired by 7:15 p.m. on Friday, February 20, 1976. The following Saturday and Sunday are, however, excluded from the computation. The remaining 24 hours would have expired at 7:15 p.m. on Monday, February 23, 1976. Because the Municipal Court was not likely in session at that time, however, it would appear that the Richmond Police had until the conclusion of the court's session on Tuesday, February 24, 1976, in which to arraign Petitioner on the remaining charges, including the investigation for murder filed by Detective Collier. Thus, all of the pending charges "expired" on the day preceding the date upon which Petitioner confessed.

■ 14. As noted previously, however, Petitioner was also detained pursuant to a "parole hold" placed upon him on Thursday, February 19, 1976. A hold may be placed upon a parolee solely upon the authority of a parole officer in, for example, the following situations:

"A 'parole hold' occurs when a parole agent or other representative of the [Adult] Authority causes a parolee to be restrained in custody independent of any action by the decision-making component of the Authority. The situation occurs (1) when the parole agent believes that the parolee has violated a condition of parole, [or] (2) when the parolee has been arrested on a new criminal charge—a prima facie violation of parole ... Common to [both of these] situations is the power of the agent to have the parolee restrained merely by exercising his authority to take the parolee into custody and book him into a local jail or, in the event he is already in jail, prevent him from being released on bail."

*In re Law,* 109 Cal.Rptr. 573, 575, 10 Cal.3d 21, 24, 513 P.2d 621, 623 n. 2 (1973 (In Bank). A parole hold may also be placed upon a parolee for the purpose of initiating new criminal charges. *People v. Gordon,* 84 Cal. App.3d 913, 921, 149 Cal.Rptr. 91, 95, (1978).

■ 15. Although there was no evidence presented as to the basis for the parole hold, it is clear that it would have been a proper exercise of the parole officer's authority to detain Petitioner once he was notified of Petitioner's arrest on the burglary charge.

16. Petitioner's parole officer would also have exercised his authority properly if he placed the hold because he believed Petitioner murdered the victim in this case. *People v. Gordon,* 84 Cal.App.3d 913, 921, 149 Cal. Rptr. 91, 95 (1978).

17. Because the Court has found that Petitioner was properly detained via the hold placed upon him by his parole officer on February 19, 1976, the only remaining question is the effect of Section 825 upon the continuing validity of the parole hold.

■ 18. The provisions of Section 825 of the California Penal Code do *not* apply in situations where an individual is detained pursuant to a parole detention hold. *O'Neal v. Superior Court,* 185 Cal.App.3d 1086, 1091, 230 Cal.Rptr. 257, 259 (Cal.App. 2 Dist.1986); *People v. Gordon,* 84 Cal.App.3d 913, 923, 149 Cal.Rptr. 91, 96 (1978).

19. The rationale for this rule is that once a parole hold is in effect, a defendant is "no longer being detained *prior to arraignment* ... [he is] now being held in connection with

---

**18.** While matters of state law generally are not cognizable in federal habeas proceedings, the Court may consider whether an abuse of state law constituted coercive police conduct.

his status as a prisoner—constructive or actual—of the Adult Authority." *People v. Gordon*, 84 Cal.App.3d 913, 923, 149 Cal. Rptr. 91, 96 (1978) (emphasis in original).

20. Although a prisoner subject to a parole hold need not be arraigned within 48 hours, some informal hearing or inquiry on their status as a parolee is necessary within a reasonable and convenient period of time after their arrest. *See Morrissey v. Brewer*, 408 U.S. 471, 485, 92 S.Ct. 2593, 2602, 33 L.Ed.2d 484 (1972) (increasing procedural and substantive due process rights of parolees).

21. While it has been noted that the arraignment may also satisfy this inquiry, there is no prescribed period of time that has been deemed reasonable or convenient. *See e.g. People v. Gordon*, 84 Cal.App.3d 913, 923, 149 Cal.Rptr. 91, 96 (1978) (finding several days delay impliedly proper, but 45 days between the placing of the parole hold and actual arraignment on new charges violative of *Morrissey* ).

22. In Petitioner's case, the parole hold was placed on Thursday, February 19, 1976. As with the prior time computation, *even if* Section 825 were applicable, no violation of its provisions would have occurred until after 5:00 p.m. on Tuesday, February 24, 1976. In light of the fact that Arizona's formal hold and warrant for arrest were in effect by 9:02 p.m. on Wednesday, February 25, 1976, the "*Morrissey* delay" in this case was, at most, 24 hours.

23. Petitioner was not illegally detained. *People v. Gordon*, 84 Cal.App.3d 913, 923, 149 Cal.Rptr. 91, 96 (1978). Furthermore, even if Arizona had not filed its warrant on February 25, 1976, the Court would not find 10 calendar days and 6 court days of pre-arraignment delay violative of the dictates in *Morrissey*. However, while the delay in this case may not have been *unreasonable* under *Morrissey*, it appears to have been *unnecessary*. The record provides no basis for the failure to present Petitioner before a judicial officer.

24. Notwithstanding the parole hold, Petitioner was arraigned on the Fugitive Warrant in case number 172220 in a timely fashion on Monday, March 1, 1976. *See* (Rhodes, attachment 2; R.T. of 12/2/93 at pg. 102–103 [Lieutenant Parrick noting that when they received Arizona's teletyped "want" on February 25th, they had 48 hours in which to file charges in California's judicial system] ).

25. As noted, Arizona teletyped its official request that Petitioner be detained on charges of murder at 9:02 p.m. on Wednesday, February 25, 1976. Applying the provisions of Section 825, Petitioner was required to be arraigned on the Fugitive Warrant by the end of the Municipal Court's session on Monday, March 1, 1976. Petitioner was, therefore, arraigned in a timely fashion on the official Arizona charges.

26. Regardless of what Detective Collier may have believed regarding the jurisdictional basis for Petitioner's detention in the Richmond City Jail, it is clear that his detention was technically legal. Despite the Court's apprehension regarding the delay in Petitioner's arraignment, because his detention did not violate state or applicable federal law, the Court cannot find that the police were guilty of "overreaching" or coercive conduct within the meaning of *Colorado v. Connelly* and *Derrick v. Peterson*.

27. Petitioner also contends that the conditions of his confinement were poor and began to effect his physical and mental health. The issue at this juncture, however, is whether the conditions of Petitioner's confinement were, in themselves, so oppressive and coercive that absent Petitioner's own susceptibilities and Collier's actions confinement under such conditions must be deemed coercive. *See Derrick v. Peterson*, 924 F.2d 813, 819 (9th Cir.1990).

28. While the conditions were spartan, unclean, and less than ideal, they were not, in themselves, so egregious as to constitute a constitutional violation or overcome Petitioner's will during the period between his arrest and confession.

29. Petitioner's detention was legal under state law.

**1536**

30. Petitioner also provided no evidence that he suffered disparate treatment.

31. Petitioner was clothed in a paper suit only because his clothes were confiscated for evidentiary purposes. Further, he received the same amount of food and blankets as any other prisoner. Finally, the deprivation of hygienic and medical services was not peculiar to Petitioner and all those incarcerated in the facility were denied access to such services. Thus, the conditions of his confinement, while unpleasant and somewhat oppressive, were not the product of some coercive strategy.

32. Clearly the conditions of Petitioner's confinement were not so severe, cruel or unusual as to, independent of other circumstances, constitute coercive police conduct. *See e.g. Brooks v. Florida,* 389 U.S. 413, 88 S.Ct. 541, 19 L.Ed.2d 643 (1967) (finding that coercive conditions existed where prisoner confined in what was described as a "sweatbox" naked for 14 days, while under the domination of the prison officials, and while fed only 12 oz. of soup and 24 oz. of water per day).

33. The conditions of Petitioner's confinement were not *independently* coercive in nature.

**B. Alleged Violations Of *Miranda*:**

34. Petitioner contends the police engaged in coercive conduct by wilfully violating the dictates of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

35. In *Miranda,* the Supreme Court recognized the fundamental importance of the Fifth Amendment and instituted the requirement that all suspects be informed of their right to remain silent and their right to the assistance of an attorney prior to being questioned by law enforcement officials. *Miranda v. Arizona,* 384 U.S. 436, 444–45, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966).

36. "Although *Miranda* 'rights' are 'not themselves rights protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected,' *Michigan v. Tucker,* 417 U.S. 433, 444, [94 S.Ct. 2357, 2364, 41 L.Ed.2d 182] (1974), when these measures are ignored … a suspect's Constitutional rights are directly affected." *Collazo v. Estelle,* 940 F.2d 411, 418 (9th Cir.1991) (en banc).

37. "Once warnings have been given, the subsequent procedure is clear. If the individual indicates *in any manner,* at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda v. Arizona,* 384 U.S. 436, 473–74, 86 S.Ct. 1602, 1627, 16 L.Ed.2d 694 (1966) (emphasis added).

38. Although interrogation must cease upon a defendant's assertion of his right to remain silent, the assertion of that right is not a permanent bar to further custodial questioning. *Michigan v. Mosley,* 423 U.S. 96, 102, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975). Rather, the right to remain silent ensures the individual's ability to "cut off questioning." *Id.* at 103, 96 S.Ct. at 326 (quoting *Miranda v. Arizona,* 384 U.S. at 479, 86 S.Ct. at 1630).

39. Whether custodial statements obtained after assertion of the right are admissible depends upon whether the right was "scrupulously honored." *Michigan v. Mosley,* 423 U.S. at 104, 96 S.Ct. at 326.

40. Collier informed Petitioner of his *Miranda* rights on February 19, 1976, prior to speaking with him about the burglary charge upon which he was arrested the previous day. In response to Collier's questions Petitioner invoked his right to remain silent by informing Collier that there wasn't much to say and by not responding to further questions. Clearly Petitioner invoked his right to remain silent within the meaning of *Miranda.*

41. Within a short period of time after invoking his rights, however, Petitioner was taken to the detective bureau office where various statements of a clearly intimidating nature were made in his presence. Whether this conduct constitutes interrogation presents a mixed question of law and fact. *United States v. Disla,* 805 F.2d 1340, 1347 (9th Cir.1986).

42. The functional equivalent of interrogation may be found where the statements or actions of the police are "reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1685, 64 L.Ed.2d 297 (1980). This inquiry involves consideration from the point of view of the suspect rather than focusing solely on the intent of the police. *Id.; See also United States v. Disla,* 805 F.2d 1340, 1347 (9th Cir.1986) (noting that the intent of the officer in asking the questions is relevant); *United States v. Henley,* 984 F.2d 1040, 1043 (1993) (noting same).

43. Petitioner testified that he was intimidated by these statements and believed that the police would not release him until he told them what they wanted to know. These statements clearly constituted a form of coercion and Collier admitted that they were designed to elicit a statement. These actions, therefore, were the functional equivalent of interrogation. *See Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980) (noting that *Miranda* safeguards apply whether a person is subjected to "express questioning or its functional equivalent.").

44. Petitioner's *Miranda* rights were, therefore, not "scrupulously honored."

45. Later that day Collier arrested Petitioner for investigation of murder based upon an informal request made by Detective Scott.[19] At this time, Petitioner was neither read his *Miranda* rights nor was he questioned regarding the offense. The following day, however, Petitioner was questioned by Detectives Scott and Collier. Prior to being questioned, Petitioner was again read his *Miranda* rights, declined to speak about the Arizona homicide, but did request information about related issues such as extradition proceedings.

46. This request for information did not vitiate his invocation of rights with respect to the Arizona homicide. *Michigan v. Mosley,* 423 U.S. at 104–05, 96 S.Ct. at 326–

27; *See also United States v. Thierman,* 678 F.2d 1331, 1335 (9th Cir.1982) (noting that a suspect in custody may selectively waive or invoke his right to remain silent).

47. Despite invoking his right to remain silent, however, the interrogation continued. Specifically, when Detectives Scott or Collier initiated the conversation regarding the death penalty, it was for the sole purpose of intimidating Petitioner and the officers should reasonably have known that such conduct was likely to elicit an incriminating response in light of the circumstances under which it occurred. *See Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980); *U.S. v. Wallace,* 848 F.2d 1464, 1475 (9th Cir.1988); *United States v. Disla,* 805 F.2d 1340, 1347 (9th Cir.1986).

48. The Court finds that in light of these circumstances and Collier's statement that Scott continued questioning Petitioner immediately after Petitioner invoked his right to remain silent, it is clear that the police again failed to "scrupulously honor" Petitioner's right to remain silent.

49. In the days following Detective Scott's interview and preceding Petitioner's confession, Detective Collier frequently and repeatedly visited Petitioner. Collier initially characterized these visits as merely friendly and the Arizona Supreme Court found that they involved little more than general discussion of matters pertaining to Petitioner's extradition or background.

50. "The routine gathering of background or 'booking' information ordinarily does not constitute interrogation." *United States v. Disla,* 805 F.2d 1340, 1347 (9th Cir.1986) (citations omitted). Moreover, *Miranda* does not preclude officers from informing the defendant of evidence against him or other circumstances that may allow the suspect to make an intelligent decision. *See United States v. Rodriguez–Gastelum,* 569 F.2d 482, 486–88 (9th Cir.) *cert. denied,* 436 U.S. 919, 98 S.Ct. 2266, 56 L.Ed.2d 760 (1978); *See also United States v. Wilson,* 571

---

19. The Court again notes that no *formal* warrant or other document was provided by Arizona to justify Collier's actions at that time.

F.2d 455, 456 (9th Cir.1978) (same); *United States v. Pheaster*, 544 F.2d 353, 368 (9th Cir.1976), *cert. denied sub nom Inciso v. United States*, 429 U.S. 1099, 97 S.Ct. 1118, 51 L.Ed.2d 546 (1977) (finding no violation of *Miranda* when officer informed suspect of the extent of the evidence against him).

51. The Ninth Circuit Court of Appeals has, however, "recognize[d] the potential for abuse by law enforcement officers who might, under the guise of seeking 'objective' or 'neutral' information, deliberately elicit an incriminating statement from a suspect." *United States v. Booth*, 669 F.2d 1231, 1237 (9th Cir.1981); *See also United States v. Poole*, 794 F.2d 462 (9th Cir.1986), *as amended* 806 F.2d 853 (1986) (noting that even routine questioning can constitute interrogation based upon facts of particular case).

■ 52. Detective Collier admitted to repeatedly visiting Petitioner with the *intent of obtaining a statement* from him. *See United States v. Disla*, 805 F.2d 1340, 1347 (9th Cir.1986) (noting that "[t]he officer's intent in asking the question is relevant.").

53. The evidence established that the subjects discussed were not merely tangential to the homicide investigation nor were the discussions merely Collier's summarizations of the evidence garnered. Rather, the conversations were attempts to slowly amass evidence establishing Petitioner's whereabouts before or after the shooting or to elicit a full confession.

54. "No distinction can be drawn between statements which are direct confessions and statements which amount to 'admissions' of part or all of the offense. The privilege against self-incrimination protects the individuals from being compelled to incriminate himself in any manner; it does not distinguish degrees of incrimination." *Miranda v. Arizona*, 384 U.S. 436, 476, 86 S.Ct. 1602, 1629, 16 L.Ed.2d 694 (1966).

55. The subject matters discussed coupled with Collier's intent rendered these meetings the functional equivalent of interrogation.

■ 56. The Arizona Supreme Court's findings, therefore, are not supported by the now more complete record and are not entitled to a presumption of correctness under 28 U.S.C. § 2254(d).

■ 57. Collier also failed to re-advise Petitioner of his rights prior to each meeting. Such warnings were necessary to remind Petitioner that he was in an adversarial situation and "that he [was] not in the presence of persons acting solely in his interest." *Miranda v. Arizona*, 384 U.S. at 469, 86 S.Ct. at 1625.

■ 58. Petitioner has demonstrated by a preponderance of the evidence that he repeatedly invoked his right to remain silent, that his rights were not scrupulously honored, and that he was not properly advised of his rights prior to several interrogation/questioning sessions. Petitioner has, therefore, objectively demonstrated the existence of coercive police conduct sufficient to satisfy the prerequisites to the voluntariness inquiry as required by *Colorado v. Connelly*.

Having concluded that no one factor rendered Petitioner's confession involuntary, the Court must now determine if the totality of all the factors would have rendered the Petitioner's confession involuntary.

## II. WAS PETITIONER'S STATEMENT VOLUNTARILY GIVEN?

■ 59. To determine the voluntariness of a confession, the Court must consider the effect that the totality of the circumstances had upon the will of the petitioner. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 226–27, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). The totality of the circumstances includes consideration of the characteristics of the accused and the interrogation techniques utilized.[20] *Id.*

■ 60. A statement was not made voluntarily if, in light of the totality of the

---

**20.** Some relevant characteristics of the accused include lack of education, low intelligence, deprivation of counsel, length of detention, the nature and duration of the questioning, and the use of physical punishment such as deprivation of food or sleep. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973).

circumstances, the defendant's will was overborne at the time that he made the statement. *See Boulden v. Holman,* 394 U.S. 478, 480, 89 S.Ct. 1138, 1139–40, 22 L.Ed.2d 433 (1969); *Haynes v. Washington,* 373 U.S. 503, 513, 83 S.Ct. 1336, 1343, 10 L.Ed.2d 513 (1963).

61. "Coercion is determined from the perspective of the suspect." *Illinois v. Perkins,* 496 U.S. 292, 296, 110 S.Ct. 2394, 2397, 110 L.Ed.2d 243 (1990) (citing *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980)). The requisite coercion exists and a statement may be involuntary where it is obtained "by any sort of threats or violence, [or] by any direct or implied promise, however slight, [or] by the exertion of any improper influence." *U.S. v. Leon Guerrero,* 847 F.2d 1363, 1365–66 (9th Cir.1988). The record must indicate, however, that the petitioner's "will [was] overborne and his capacity for self-determination critically impaired." *Culombe v. Connecticut,* 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961); *Aiken v. Blodgett,* 921 F.2d 214 (9th Cir.1990), *cert. denied,* 502 U.S. 839, 112 S.Ct. 125, 116 L.Ed.2d 93 (1991).

### A) What rights did Petitioner invoke?

62. As noted in the previous discussion regarding coercive police conduct, Petitioner clearly invoked his right to remain silent on several occasions. Further, he maintained his silence with respect to his involvement in the homicide for approximately six full days after being accused of the offense. As the Court found, Petitioner's right to remain silent was not "scrupulously honored."

63. Petitioner invoked his right to remain silent, however, the procedural safeguards implicated by that right do not include the presumption that he requested counsel or was unable to proceed further without the assistance of counsel. *See Michigan v. Mosley,* 423 U.S. at 104 n. 10, 96 S.Ct. at 326 n. 10 (noting distinction between right to remain silent and request for counsel); *See also Arizona v. Roberson,* 486 U.S. 675, 683, 108 S.Ct. 2093, 2098–99, 100

L.Ed.2d 704 (1988); *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981) (noting same).

64. Whether an accused has actually invoked his right to counsel is an objective inquiry. *Davis v. United States,* — U.S. —, —, 114 S.Ct. 2350, 2355, 129 L.Ed.2d 362 (1994).

65. To invoke the *Miranda* right to counsel "'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'" *Davis v. United States,* — U.S. at —, 114 S.Ct. at 2355 (quoting *McNeil v. Wisconsin,* 501 U.S. 171, 178, 111 S.Ct. 2204, 2209, 115 L.Ed.2d 158 (1991)).

66. If a suspect's reference to counsel is ambiguous or equivocal, however, authorities need not cease questioning. *Id.*

67. A suspect's request is unambiguous only if a reasonable police officer hearing the statement would clearly understand it to be a request for an attorney. *Id.* If, however, "a reasonable police officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." *Id.* (emphasis in original).

68. Petitioner did not request counsel when first read his *Miranda* rights in relation to the California burglary charges. Nor did Petitioner invoke his right to counsel during the taped interview with Detective Scott. At most Petitioner may have mentioned that he *expected* to be appointed an attorney upon being arraigned. As noted previously, however, he also testified that he did not ask Collier for a lawyer because he believed it beyond Collier's power to provide him one and could see little point in making such a request.

69. This is *not* an unambiguous request for counsel and a police officer in Detective Collier's position and in light of all of the circumstances would not necessarily interpret the reference as a request for the assistance of an attorney.[21] In light of this fact,

21. Although insufficient to overcome the requirements of *Davis,* there is some evidence in the

Collier was not required to cease questioning Petitioner until counsel was appointed.[22]

70. The fact that Petitioner misperceived the need to make his wishes known to Detective Collier and affirmatively invoke his right to counsel in an unambiguous fashion does not alter the result. *Davis v. United States,* — U.S. at —, 114 S.Ct. at 2356 (recognizing that a variety of factors may prevent a suspect from rendering a clear invocation of the right, but noting that the primary protection afforded are the *Miranda* warnings themselves).

 71. The fact that Petitioner failed to invoke his right to counsel eliminated the need to implement various procedural protections. That failure did not, however, relieve Collier of the responsibility to "scrupulously honor" Petitioner's Fifth Amendment rights.

### B) Did Petitioner voluntarily waive his Fifth Amendment rights?

72. After having been removed from his cell at Collier's direction and provided a toothbrush at Collier's expense, Petitioner responded to one of Collier's repeated offers to talk and agreed to provide the statement now challenged as involuntary. Respondents contend the fact Petitioner requested to meet with Collier in any capacity indicates that the statement was made voluntarily. Moreover, Respondents argue the fact that Petitioner received a fresh set of *Miranda* warnings indicates that he willingly waived his rights and voluntarily provided the statement.

73. The state courts found that Petitioner voluntarily waived his *Miranda* rights, thereby implicitly finding that he knowingly and intelligently waived his rights as well. *State v. Arnett,* 119 Ariz. 38, 45, 579 P.2d 542, 549 (1978).

 74. Although the determination of whether Petitioner voluntarily waived his rights is subject to de novo review in these proceedings, the finding that he *knowingly* waived his rights with a full appreciation for

the ramifications of that decision is entitled to a presumption of correctness pursuant to 28 U.S.C. § 2254(d). *Derrick v. Peterson,* 924 F.2d at 821.

75. The state court's finding of a knowing and intelligent waiver is fully supported by the state court record and the evidence established at the evidentiary hearing. Moreover, the evidence clearly demonstrates to this Court that Petitioner provided a statement with a complete understanding of the nature of his rights and the consequences of his actions.

 76. The test for determining whether Petitioner *voluntarily* waived his Miranda rights is, however, based upon the totality of the circumstances and is subsumed within the voluntariness inquiry. *See Collazo v. Estelle,* 940 F.2d at 415.

77. Whether Petitioner waived his rights will, therefore, be decided within the context of determining whether his statements were voluntary.

### C) Was Petitioner's Confession Voluntary?

78. "[C]ustodial interrogations, by their very nature, generate 'compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.'" *Moran v. Burbine,* 475 U.S. 412, 420, 106 S.Ct. 1135, 1140, 89 L.Ed.2d 410 (1986).

79. The Supreme Court has noted that "coercion can be mental as well as physical, and that the blood of the accused is not the only hallmark of an unconstitutional inquisition." *Blackburn v. State of Alabama,* 361 U.S. 199, 206, 80 S.Ct. 274, 279, 4 L.Ed.2d 242 (1960).

80. It is clear that even if Collier did not orchestrate Petitioner's continued confinement in the Richmond jail, he took undue advantage of both the inherent pressures of confinement itself and the conditions and circumstances occurring in this case. "At a

---

record indicating that Collier should have known Petitioner wanted/expected the assistance of an attorney.

**22.** In light of the Court's resolution of this issue, the Court has no need to discuss the retroactive application of various cases such as *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

point where the law required [Collier] to back off, he did not 'scrupulously honor' [Petitioner's] right to cut off questioning; he stepped on it." *Collazo v. Estelle,* 940 F.2d at 417.

▮▮▮ 81. The mere fact that Petitioner received new *Miranda* warnings prior to providing a statement does not prove that Petitioner voluntarily waived his rights. The Court must consider the circumstances which may have lead to that waiver. *See United States v. Fouche (Fouche II),* 833 F.2d 1284, 1288 (9th Cir.1987), *cert. denied,* 486 U.S. 1017, 108 S.Ct. 1756, 100 L.Ed.2d 218 (1988).

▮▮▮ 82. "Whatever the testimony of the authorities as to waiver of rights by an accused, the fact of lengthy interrogation or incommunicado incarceration before a statement is made is strong evidence that the accused did not validly waive his rights." *Miranda v. Arizona,* 384 U.S. 436, 476, 86 S.Ct. 1602, 1629, 16 L.Ed.2d 694 (1966); *See also U.S. v. Wilson,* 838 F.2d 1081, 1087 (9th Cir.1988) (noting that the government's reliance on a waiver of *Miranda* rights becomes weaker as the period of pre-arraignment detention increases).

▮▮▮ 83. Similarly, the fact that Petitioner initiated the meeting in some fashion does not render the subsequent statement voluntary. It is the circumstances occurring before a confession is given that are the key, and the fact that due to those actions a suspect initiates conversations with the police does not dispositively determine the question. *See e.g. Collazo v. Estelle,* 940 F.2d 411, 422–23 (9th Cir.1991) (en banc) (noting that initiation of a conversation must originate from an "unbadgered" desire to speak with the police).

▮▮▮ 84. During the entire time Petitioner was incarcerated under oppressive, but not inhumane conditions, and while suffering from an acute chronic sinus condition he was continuously approached and questioned by Detective Collier.

85. Petitioner was also psychologically affected by the duration and conditions of his confinement.

▮▮ 86. Minor medical conditions alone will rarely render a confession involuntary. *See e.g. U.S. v. Kelley,* 953 F.2d 562, 565 (9th Cir.1992) (defendant undergoing custodial questioning while entering the initial phases of a heroin withdrawal remained coherent and responsive and, therefore, statements were voluntary); *United States v. Lewis,* 833 F.2d 1380, 1384–85 (9th Cir.1987) (statements voluntary where defendant was alert and responsive despite being in the hospital under a general anesthetic); *United States v. Martin,* 781 F.2d 671, 674 (9th Cir.1985) (statement voluntary where defendant was not unconscious or comatose and engaged in coherent and continuous conversation even though in hospital and groggy from pain killers). The Court notes that while it has considered Petitioner's physical characteristics it has not accorded undue weight to his condition. Rather, it is the psychological effect his health had as one factor overbearing his will.

87. While it may be true that Petitioner was street-wise, "[a]ssessments of the knowledge the defendant possessed, based on information as to his age, education, intelligence, or prior contact with authorities, can never be more than speculation." *Miranda v. Arizona,* 384 U.S. 436, 468–69, 86 S.Ct. 1602, 1625, 16 L.Ed.2d 694 (1966).

88. Petitioner maintained his silence for seven days and has demonstrated by a preponderance of the evidence that he did not alter his position until his will was simply overborne by the unexplained delay, his personal fear of the conditions of his confinement, and improper police conduct. *See Michigan v. Harvey,* 494 U.S. 344, 350, 110 S.Ct. 1176, 1180, 108 L.Ed.2d 293 (1990) (noting that suspects who assert their rights are less likely to waive that right of their own accord in subsequent interrogations); *See also Collazo v. Estelle,* 940 F.2d at 422–23 (noting that a request to speak with officers was nothing more than the "delayed product" of a coercive strategy and that the subsequent provision of rights was an "empty ceremony.").

89. While Petitioner may have been street-wise and aware of what was happening, he also was aware that his rights were not respected, he was confined for an inordi-

nate albeit technically legal time in the Richmond jail, and he was in fear for his continued health. These factors coupled with the threat that he would not be released until he confessed served to overcome his will. The mere fact that Petitioner had some experience with law enforcement authorities does not counteract the combined effect of these coercive influences.

90. The Court of Appeals has noted additional factors meriting consideration when determining the effect of prior police coercion:

Whether (1) there was a break in the stream of events sufficient to insulate the statement from the effect of the prior coercion, (2) it can be inferred that the coercive practices had a continuing effect that touched the subsequent statement, (3) the passage of time, a change in the location, or a change in the identity of the interrogators interrupted the effect of the coercion, and (4) the conditions that would have precluded the use of a first statement had been removed.

*Collazo,* 940 F.2d at 421 (citing *United States v. Patterson,* 812 F.2d 1188, 1192 (9th Cir. 1987)).

91. In the instant case there was no intervening event that would have diminished or removed the coercive influence of Collier's repetitive contacts.

92. It is also clear that Collier's coercive and improper conduct had a continuing effect upon Petitioner's will and eventually caused Petitioner to render a statement.

93. Similarly, there was no change in interrogators, and the passage of time in this case served only to enhance the pressures operating upon Petitioner's will.

94. In light of the totality of the circumstances Petitioner's confession was involuntary.

### III. WAS THE ADMISSION OF PETITIONER'S INVOLUNTARY STATEMENT HARMLESS?

 95. The erroneous admission of a coerced or involuntary confession is subject to harmless error analysis. *Arizona v. Ful-*

*minante,* 499 U.S. 279, 111 S.Ct. ‘1246, 113 L.Ed.2d 302 (1991).

96. The Court is mindful, however, of the impact the Supreme Court noted that a full confession may have on the course of a trial:

A confession is like no other evidence. Indeed, "the defendant's own confession is probably the most probative and damaging evidence that· can be admitted against him ... While some statements by a defendant may concern isolated aspects of the crime or may be incriminating only when linked to other evidence, a full confession in which the defendant discloses the motive for and means of the crime may tempt the jury to rely on that evidence alone in reaching its decision.

*Arizona v. Fulminante,* 499 U.S. at 296, 111 S.Ct. at 1257–58 (citations omitted).

 97. The harmless error test previously required a federal habeas court to determine whether, based on the entire record, it appeared "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

98. Recently, however, the Supreme Court modified the test to be applied on collateral review. A federal court on habeas review must now apply a more deferential standard and its inquiry is whether the error had a " 'substantial and injurious effect or influence in determining the jury's verdict.' " *Brecht v. Abrahamson,* —— U.S. ——, ——, 113 S.Ct. 1710, 1714, 123 L.Ed.2d 353 (1993) (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)). If the error did not have such an effect, habeas relief is not warranted.

99. Justice Stevens' concurring opinion in *Brecht* is particularly helpful in determining the manner in which it is to be applied. Justice Stevens wrote:

[W]e would misread *Kotteakos* itself if we endorsed only a single-minded focus on how the error may (or may not) have affected the jury's verdict. The habeas court cannot ask only whether it thinks the Petitioner would have been convicted even if the constitutional error had not taken

place. *Kotteakos* is full of warnings to avoid that result. It requires a reviewing court to decide that "the error did not influence the jury" ... and that "the judgment was not substantially swayed by the error."

*Brecht*, —— U.S. at ——, 113 S.Ct. at 1724.

■ 100. Application of the *Brecht* standard leads the Court to conclude that the error in admitting Petitioner's statement did have a substantial and injurious influence on the jury's verdict. Several factors lead the Court to this conclusion.

101. First, as the Arizona Supreme Court noted, most of the facts concerning the motivation for the murder and the manner in which it occurred were derived solely from Petitioner's confession. *See State v. Arnett*, 119 Ariz. at 41, 579 P.2d at 545. Although the prosecution's case was strong, it was also largely circumstantial without Petitioner's confession. There were no witnesses to the crime or other conclusive proof that Petitioner committed the crimes for which he was charged.

102. Second, although the prosecution argued three separate theories of murder, it used Petitioner's statement to support some aspect of each theory. For example, Petitioner's confession provided the requisite "intent" to commit robbery and, thereby enable the State to argue felony-murder. This conclusion is supported by the fact that Petitioner was originally charged only with the theft of the victim's truck. Similarly, the State relied upon Petitioner's admission that he paused briefly before shooting the victim to overcome evidence that Petitioner may not have premeditated before shooting the victim. Again, the State utilized Petitioner's statement to bolster other testimony placing Petitioner at the scene of the crime in support of its theory that Petitioner was "lying in wait." Finally, the State utilized Petitioner's statement to argue against the possibility of voluntary manslaughter. *See e.g.* (R.T. of 7/22/76 at pgs. 92, 100–103, 130, & 135).

103. Clearly the admission of Petitioner's involuntary statement had a substantial and injurious effect upon the evidence presented in this case. Moreover, it strains reason to argue that it had less than a substantial influence upon the jury's determination of guilt.

104. Accordingly, Petitioner is entitled to a new trial free of any violation of his Fifth Amendment rights.

## CONCLUSION

The evidence reveals that Petitioner, a "street-wise" ex-con, and Detective Collier, a determined police officer, began their brief relationship as what may best be described as the proverbial contest between cat and mouse, each seeking to out wit and out maneuver the other. Petitioner attempted to conceal his identity and invoke his right to remain silent while Collier persistently questioned, detained, and eventually succeeded in obtaining Petitioner's confession. While it is clear that Arnett was not an innocent bystander or an unwitting participant in this maneuvering, he was entitled to the benefits of the rules governing such confrontations: the provisions of the United States Constitution. Unfortunately, Detective Collier got caught up in the pursuit of obtaining Arnett's confession. As a result, his duties and responsibilities under the law became obscured. In the final analysis, the combination of factors described in this opinion rendered Arnett's consent meaningless. Under the circumstances, which bear a striking resemblance to *Collazo v. Estelle*, the confession cannot stand.

In reaching its conclusion, the Court placed significant reliance on the testimony of Lieutenant Parrick. The Court found Lieutenant Parrick persuasive and candid. His testimony filled in gaps in the prior record. Lieutenant Parrick was not concerned with whether his testimony would be construed as being favorable or unfavorable to either party. He simply recounted events candidly which brought clarity to the issues. His testimony reflected the respect and sensitivity for the responsibilities that a law enforcement officer bears, especially in these most difficult cases.

## OTHER MATTERS

During the evidentiary hearing Respondents informed the Court that upon resolu-

tion of this claim Respondents intended to request reconsideration of various sentencing phase claims previously determined by Judge Hardy. As the Court has found that Petitioner is entitled to a new trial, the Court will not consider motions for reconsideration with respect to sentencing phase claims as those issues are effectively moot. *See Blazak v. Ricketts,* 971 F.2d 1408, 1413 (9th Cir.1992) (A grant of habeas relief requiring a new trial renders sentencing issues moot).

Based upon the above Findings of Fact and Conclusions of Law,

**IT IS HEREBY ORDERED** granting Petitioner's petition for writ of habeas corpus as it relates to the guilt phase of Petitioner's trial. Petitioner's conviction is vacated subject to a new trial in the state courts within a reasonable period of time not to exceed 180 days.

**IT IS FURTHER ORDERED** that no motions for reconsideration of sentencing phase claims by either party will be considered.